UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

SAMUEL M. ROBERTS,

                Plaintiff,

vs.

LOS ALAMOS NATIONAL SECURITY, LLC, AWE, PLC., MASSACHUSETTS INSTITUTE OF TECHNOLOGY,

                Defendants,
                Third-Party Plaintiffs,

vs.

UNIVERSITY OF ROCHESTER

                Third-Party Defendant.

**AFFIDAVIT OF HANS W. HERRMANN**

Civil No. 11 CV 6206L

STATE OF NEW YORK  )
COUNTY OF MONROE  ) ss:

Hans W. Herrmann., being duly sworn, deposes and states:

1.    That I am employed by Los Alamos National Security, LLC (LANS), and I hold the position of R&D Scientist 4.

2.    That my area of expertise is plasma physics, including inertial confinement fusion, gamma ray physics and implosion diagnostics. I hold a Bachelors degree in Applied and Engineering Physics from Cornell University. I am a graduate of the Navy Nuclear Power School. I have Master's and Ph.D. degrees in Astrophysical Sciences from Princeton University with a specialty in controlled thermonuclear fusion energy. I am a research and development scientist involved in inertial confinement fusion and weapons physics at Los Alamos National Laboratory ("LANL"). I have previously served as a nuclear trained officer aboard Trident Ballistic Missile Submarines and have more recently been involved in an international

{1613093:2 }

collaboration investigating inertial confinement-fusion with a specialty in gamma ray physics.

3. That in the course of my employment, in 2006 I became a project leader for an experimental campaign referred to as the DT Ratio Experiment. "DT" refers to deuterium-tritium. This campaign, supported by the National Nuclear Security Agency under the U.S. Department of Energy, has been conducted over a number of years.

4. That one of the many days and locations where certain tests were run in furtherance of this experimental campaign included testing conducted on August 6, 2008, at the Laboratory for Laser Energetics ("LLE") in Rochester, New York.

5. That I was designated as the principal investigator for this testing date. In that role, and well in advance of the date, I prepared a Shot Request Form which I set forth certain details of the proposed testing, which included such items as who would be allowed to access data from that day's test and what scientific diagnostic equipment (referred to as "diagnostics") was requested to be present. Diagnostics are used to record and measure data collected from the tests. I submitted the Shot Request Form to the Facility and Scheduling committee at the LLE for its approval. Once the proposals were submitted, they were reviewed by the University of Rochester's personnel at the LLE, who could accept, deny, or modify the proposal. The requested scientific testing could not go forward until approval was issued.

6. That the laser-fusion implosion testing at the LLE is conducted within a secured area, referred to as the Target Bay. That the diagnostics used to record data what were approved by the University of Rochester are installed in the Target Bay. The diagnostics seek to record data generated from a laser-fusion "shot," which takes place inside of a vacuum chamber within the Target Bay. That when an actual "shot" is taking place, no people can be inside of the Target Bay. Each "shot" is conducted by the University of Rochester staff from another secure area known as the Control Room.

{1613093:2 }

7. That the entire Target Bay area is solely under the complete control of the LLE. No one can enter the Target Bay without the approval of the LLE's Shot Director. Even with approval to enter the Target Bay, any non-LLE employee, including me, must be accompanied by an LLE escort. Special protective clean room suits and laser goggles are required.

8. That during a "shot day", including August 6, 2008, I am in a separate conference room in the building, where I review data generated from the diagnostics from a laptop computer, or in the basement below the Target Bay, known as LaCave, making adjustments to the electronic monitoring equipment I brought to LLE from LANL.

9. That I was in charge of the physics objectives in terms of developing hypotheses and formulating an experiment to test the hypotheses. The Shot Director was in charge of the operation of the equipment and the logistics of carrying out the tests.

10. That as to the "light pipe" involved in this matter, I asked the University of Rochester's Vladimir Glebov for permission to include it on the Shot Form as an applicable diagnostic so that data from the light pipe would be available, but that request did not include a request for physical access to the light pipe.

11. That, prior to the accident occurring, I had never directly seen the light pipe diagnostic nor ever approached it in the Target Bay. It was my understanding that no one except personnel from the LLE could have any direct contact with the light pipe and to my knowledge no one from LANL ever had any connection with the light pipe, although I may have passed it on one of my few escorted entries into the Target Bay without specifically knowing what it was.

12. That no one from LANL, including myself, had any connection with the design, testing, assembly, installation, or use of this diagnostic at any time prior to August 6, 2008 or thereafter.

13. That Mr. Roberts was not employed by and did not work for LANL. That neither

{1613093:2 }

myself or anyone on my team from LANL had any control over any of his activities or his terms of employment. While I knew him as a person who worked at the LLE, he did not report to me and I had no authority to request or direct him to do anything. I have no direct personal knowledge of any instructions that Dr. Glebov gave to Mr. Roberts to make certain adjustments in the light pipe mechanism on the day in question. At no time did I request, or did anyone from LANL, that Mr. Roberts do anything with respect to the light pipe.

14. That the employees of the LLE, in particular the shot director, controlled all of the activities that took place in the Target Bay. Nothing could take place in the Target Bay without the consent and approval of the LLE staff, particularly the Shot Director.

15. That under the rules of the LLE, neither myself or any member of my team at LANL could exercise any direction or control over the LLE or its activities or employees, including the light pipe and Mr. Roberts. The University of Rochester never requested me to conduct any investigation into safety within the Target Bay at the LLE. It maintained an entire chain of command with regard to safety, which consisted solely of designated University personnel. I was not allowed to touch any University of Rochester diagnostics or equipment within the Target Bay even with a supervised escort from LLE beside me.

16. That at no time was I asked by the LLE to consult with the LLE personnel over any issues pertaining to safety at the LLE. The only possible exception was with respect to any questions concerning diagnostics and equipment that we brought to the LLE from Los Alamos. The light pipe was not one of those.

_____
Hans W. Herrmann

Sworn to before me this
3rd day of October, 2012.

_____
Notary Public

Sept 16, 2013
My Commission Expires

{1613093:2 }