UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

| | |
|---|---|
| SAMUEL M. ROBERTS, | |
| Plaintiff, | |
| -vs- | **SUPPLEMENTAL AFFIDAVIT OF SAMUEL F. B. MORSE IN FURTHER SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |
| LOS ALAMOS NATIONAL SECURITY, LLC, AWE, PLC, and MASSACHUSETTS INSTITUTE OF TECHNOLOGY, | |
| Defendants, Third-Party Plaintiffs, | Civil Case No.: 11-cv-6206(L) |
| -vs- | |
| UNIVERSITY OF ROCHESTER, | |
| Third-Party Defendant. | |

---

STATE OF NEW YORK )
COUNTY OF MONROE ) ss.:

Samuel F. B. Morse, being duly sworn, deposes and says:

1. I am employed by the University of Rochester ("University") in the Laboratory for Laser Energetics ("LLE") as the Omega Facility Division Director. As noted in my initial affidavit submitted in support of this motion (Dkt. 57), I am responsible for oversight and operation of the Omega Facility. I am fully familiar with the University's policies and procedures relative to operation of the LLE.

2. I reviewed the Memorandum of Law submitted by plaintiff's counsel in opposition to the University's motion (Dkt. 63-10). This Memorandum contains numerous

misunderstandings of LLE policies and procedures and erroneous conclusions that are not supported by LLE documentation.

3. Dr. Herrmann had no responsibility for qualifying the light pipe, nor did any University policy somehow transfer responsibility to him. The light pipe was University property, and was designed, manufactured, installed and maintained solely by University personnel.

4. In fact, Dr. Glebov, as the PI for the light pipe, was responsible for qualifying the light pipe per LLE Instruction 7700, and he did so in 2006. (I note that plaintiff's counsel cites to and attaches an inapplicable version of LLE Instruction 7700 dated 15 August 2007 (Dkt. 63-8). That version was not in existence in 2006 when Dr. Glebov put the light pipe through the qualification process. The correct version of LLE Instruction 7700 was attached to Dr. Glebov's affidavit (Dkt. 56-8, pp. 14-20).) The light pipe had been used in OMEGA experiments since being qualified in 2006.

5. LFORM §4.3.1.2 (Dkt. 56-6, p.13), stating that "All **new** diagnostics must be fully qualified by Wednesday, two weeks before the date of the experiment" [emphasis added] did not apply to the light pipe -- it was not a new diagnostic.

6. And, LFORM §4.3.1.2 does not require the experimental PI to qualify a new diagnostic; the PI for the diagnostic would take it through the qualification process. Thus, if the light pipe were new in August 2008, or had not previously been qualified, it would have been up to Dr. Glebov as the PI for the light pipe, not Dr. Herrmann as PI for the DT Ratio experiment, to obtain the qualification before the light pipe could be used in an experiment.

7. Dr. Herrmann did exactly as the LFORM required by designating Dr. Glebov as the PI for the light pipe on the SRFs for the August 6 shots (Dkt. 56-7, p. 4). Further, when

2

completing the SRFs, Dr. Herrmann could not have selected the light pipe for use in the experiment if it had not been qualified because a non-qualified diagnostic is not selectable on the SRF electronic template.  See LFORM §4.2.1.7 (Dkt. 56-6, p. 9).

8.  Nor did the University, in its post-accident investigation, determine that Dr. Herrmann failed to comply with "the requirement that this diagnostic [the light pipe] be qualified two weeks before an experiment." (Dkt. 63-10, p.19).  I wrote this investigation report cited by counsel.

9.  The report states that, "This incident was caused by the failure to rigorously follow the procedures of LLEINST 7700 Design and Integration of Equipment, and the failure of management to comply with the requirements of LLEINST 3000…" (Dkt. 63-2, p.2).

10.  The review leading to qualification of a diagnostic as contemplated by LLE Instruction 7700 is performed only by University personnel; no employees of outside labs are involved in any way in the qualification process.  Therefore, when I noted a "failure to rigorously follow the procedures of LLEINST 7700," I was referring to the failure of University personnel to adhere rigorously to our rules.  Likewise, when I wrote that "management" failed to comply with LLEINST 3000, I was referring to University personnel.  (Neither Dr. Herrmann nor any other outside scientist is "management.")

11.  In the bullet points following the statement quoted above, I gave specific instances of the University failures to adhere to our procedures.  Thus, in the first bullet (Dkt. 63-2, p.3), I referred to the "Experimental Operations Group Leader," who permitted the light pipe to be exempted from final certification by designating it as a "developmental diagnostic."  The Experimental Operations Group Leader is a University employee.

12. In the second bullet point of my report (*Id.*), I mentioned "the PI and project coordinator for the HYTND project." The HYTND is the light pipe, and I was referring to the PI for the light pipe, Dr. Glebov, and the project coordinator, Miguel Cruz. Both are University employees. The "Mechanical Design" referred to in my third bullet (*Id.*), was performed solely by University employees, and the PI to whom I referred in the fourth bullet (*Id.*) was again Dr. Glebov. We did not conclude in our post-accident report that Dr. Herrmann bore any responsibility whatsoever related to the light pipe.

13. University policies, including the LFORM, require that any user of the LLE adhere to University safety requirements. The National Laser User's Facility (NLUF) User's Guide, cited by plaintiff's counsel, contains such language NLUF. (User's Guide §4.2 (Dkt. 63-7, p. 12)). However, the NLUF User's Guide is not applicable to the experiment conducted on the day of the accident; the experiment was not a NLUF experiment.

14. Regardless, there is no University policy that transfers the University's responsibility to operate or direct the operation of the Omega Facility, or direct activities of University personnel to outside, non-University personnel. As clearly set forth in LFORM § 4008 (Dkt. 63-3, p. 34) the Laser Facility Manager, a University employee, retains overall responsibility for the safe operation of the Omega Facility.

15. The University Principal Investigator Eligibility Policy (Dkt. 63-6, p. 2) likewise does not transfer any responsibility to an outside employee. This policy, cited by plaintiff's counsel, describes the University's policy as it pertains to an "award from an external funding agency." The policy specifically states that the term "Principal Investigator," encompasses also "Project Director, Program Director, and the like." This refers to the individual who bears the "full and final responsibility" for a project based on the external funding award.

16. The DT Ratio experiment was funded by the Department of Energy (DOE). The Notice of Financial Assistance Award (the first page of which is attached as Exhibit 24) from DOE to LLE, in box eight, identifies Dr. McCrory, the LLE Director, as the "Recipient Project Director" for the DOE funding award. Dr. McCrory, not Los Alamos' Dr. Herrmann, is the Project Director described in the University Principal Investigator Eligibility Policy. He has "full and final" responsibility for the operation of the DOE-funded program at the LLE. In contrast, Dr. Herrmann's role as a Principal Investigator was limited to the enumerated responsibilities related to his proposed experiment, outlined in the LFORM and described in paragraphs 13-27 of my previous affidavit. (*See* Dkt. 57).

17. Last, the Facility Advisory and Scheduling Committee ("FASC") has no authority to require changes to diagnostics proposed by University or outside Principal Investigators for use in the LLE. LFORM § 3.1.1 cited by plaintiff's counsel (Dkt. 56-6, pp. 2-3) provides that one function of the FASC is "to review experimental capabilities such as diagnostics and information availability and **recommend** improvements where warranted" [emphasis added].

18. The role of the FASC, as set forth in this provision, is not to review the safety of diagnostics to be used in the Omega Facility. Safety is part of the qualification process -- that is the decision to permit the use of a diagnostic in Omega Facility experiments -- which is strictly within the responsibility of University employees per LLE Instruction 7700.

19. In contrast, the FASC is a forward-looking body that may recommend improvements to the capabilities of certain diagnostics identified for use in experiments that will be scheduled in the following year. But even if the two Los Alamos employees sitting on the University's FASC had concerns with the light pipe, at best, they could have raised those concerns and/or recommended changes, but they had no authority to mandate changes or

modifications to diagnostics of any kind, or to prevent a diagnostic from being used. In fact, LFORM §3.1.1.2 (Dkt. 56-6, p. 4) provides that any recommendation from the FASC would be reported to the LLE Director and OMEGA Facility Director, both University employees. Any appropriate action would be the responsibility of those persons.

        _____s/ Samuel F. B. Morse_____
        Samuel F. B. Morse

Sworn to before me this

19 day of October, 2012

    _____s/ Joselyn Hayes_____
        Notary Public

> Joselyn Hayes
> Notary Public, State of New York
> No. 01HA6107476
> Qualified in Monroe County
> Commission Expires April 5, 2016